IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JENNIFER L. ICE,
        Plaintiff,

v.
                                     Civil Action No. 1:06CV90
                                         (Judge Keeley)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Jennifer L. Ice ("Plaintiff") filed applications for DIB and SSI on October 30, 2003, alleging

disability beginning April 15, 2002, due to mental retardation/borderline intellectual functioning

(R.62). Both applications were denied initially and on reconsideration (R. 34, 41,).[2] Plaintiff

requested a hearing, which Administrative Law Judge ("ALJ") Donald T. McDougall held on

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart as the defendant in this suit

[2] Records from Plaintiff's SSI application are missing from the administrative transcript.

February 9, 2005 (R. 456). Plaintiff appeared without counsel and the ALJ continued the hearing in order for her to obtain counsel. On August 1, 2005, the ALJ held a hearing at which Plaintiff, now represented by counsel, was present and testified, as did her mother Rita Ice and Vocational Expert Larry Ostrowski ("VE") (R. 157). On August 18, 2005, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, from April 15, 2002, through the date of his decision (R. 21). The Appeals Council denied Plaintiff's request for review (R. 6), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Jennifer L. Ice ("Plaintiff") was born on August 23, 1971, and was 33 years old at the time of the ALJ's decision (R. 62). She graduated from high school attending special education classes in all areas except for mainstreaming in music, art, and physical education, and has past relevant work experience in food service (R. 20).

On July 24, 1979 (age 7, 3rd grade), Plaintiff was referred by her classroom teacher for evaluation by the School Psychologist, Karen Edgell, "because of inability to function in the regular classroom" (R. 124). Ms. Edgell noted Plaintiff was cooperative and attempted most items on the tests, with the exception of responding with "don't know" or, infrequently, with no response at all when she didn't understand an item or thought it was too hard. She was quiet and did not initiate conversation, but established good eye contact and rapport. If she enjoyed a test, she would become animated and smile, while remaining passive if she thought a test was uninteresting.

Plaintiff's IQ, as scored on the W.I.S.C.-R., was 54 verbal, 75 performance, and 63 full scale (R. 124-125). These scores fell into the mentally deficient category. She scored below grade level on every achievement test (R. 126). Her strongest subject was spelling, in which she scored one year

below her grade level, but the psychologist felt a percentage of her correct responses were lucky guesses, "as she appeared to randomly select answers." Math scores were three years behind grade level. Plaintiff's "general information score fell below the limits of the test which indicates she is not picking up or abstracting information from her environment." Her total scores were 2.3 grade levels below her actual grade (3rd grade). On visual motor testing, Plaintiff was three years behind her chronological age (R. 126). She could copy straight lines, circles, and squares but not designs containing two operations, such as a straight line and a circle, and could not copy triangles.

Ms. Edgell concluded that Plaintiff's IQ was in the mentally deficient category, qualifying her to participate in a classroom for the educable mentally retarded. Her gross motor skills did not seem to have been as delayed as her fine motor skills, so Ms. Edgell felt Plaintiff could be mainstreamed for physical education as long as she had special services for assistance in developing fine motor skills.

On June 30, 1980 (age 8, 4th grade), School Psychologist Karen Edgell evaluated Plaintiff again upon referral by her mother (R. 117). Ms. Edgell noted that Plaintiff had been evaluated the summer before and qualified for special education, but the placement would have required her to change schools, which her mother did not want. The mother instead got a tutor for Plaintiff in an attempt to bring her up to grade level, but she continued to fall behind. Plaintiff's mother, "who was beginning to realize the extent of Jennifer's problems," asked for another evaluation.

Upon IQ testing with the W.I.S.C.-R., Plaintiff obtained scores of 64 verbal, 72 performance, and 66 full scale, again falling in the "mentally deficient" category of intelligence (R. 117-118). She displayed a short attention span but was easily redirected to the task at hand. She displayed a haphazard approach to problem solving and poor visual memory skills. Her overall language

3

development was depressed, corresponding to a deficient reading ability. Her mental age was two to two and a half years below her chronological age. In reading, she decoded the initial sound of the word and then guessed the word on the basis of that sound. She rarely scanned the entire word. She could add and subtract to ten. Her attention span became shorter as testing was administered. Her fund of knowledge abstracted from the environment was low, falling below measurable units. Her overall mental development appeared to have reached the level of a six year old child - - one just ready to enter school. It was again recommended she be placed in a program for the educable mentally retarded with instruction in all major academic areas, with mainstreaming only for art, music, and physical education.

On February 25, 1983 (age 11), School Psychologist Dr. Larry Parsons completed a "routine three year re-evaluation" of Plaintiff (R. 114). Dr. Parsons noted Plaintiff was "presently receiving Educable Mentally Handicapped (EMH) Program services." Plaintiff's IQ scores as measured on the W.I.S.C. - R. were 66 verbal, 75 performance, and 69 full scale (R. 113). These scores were again found to fall within the limits of the Mentally Deficient classification. Dr. Parsons found Plaintiff had weaknesses in visual-motor perception and fine motor coordination. She continued to have an educable mentally handicapped profile. Dr. Parsons also found Plaintiff evidenced weak social maturity (R. 116).

On January 5, 1990 (age 18, 12th grade), Plaintiff was again tested by the school psychologist as part of her regular triennial review (R. 120). She was enrolled in the special education program for mildly mentally impaired students and was taking part in an on-the-job training placement at the Hecks Department Store. School Psychologist Joseph Shaver, Ph.D. found Plaintiff was very cooperative. She was very quiet, but did not appear excessively anxious. She responded

4

appropriately and worked diligently. He found her problem-solving strategies to be "somewhat random," but she was willing to persevere even during more difficult items.

Plaintiff was given the W.A.I.S. -R. IQ test, scoring a 70 verbal, 74 performance, and 71 full scale, which Dr. Shaver opined fell into the lower end of the borderline intellectual functioning category. Her fund of general information was severely delayed and she had difficulty abstracting facts and ideas via everyday social actions. Her reasoning skills were confined to very concrete levels and she was usually unable to detect and understand abstract generalizations. Her word knowledge skills and ability to define common words were also significantly delayed. Perceptual motor integration scores indicated Plaintiff was attuned to environmental detail and was usually able to isolate an object's essential characteristics from those that were less relevant. She was also quite effective in repetitive visual-motor tasks that required a combination of speed and fine-finger dexterity. On the other hand, she had considerable difficulty when attempting to detect and understand sequential cause and effect relationships between daily environmental occurrences, and had trouble reproducing part-whole and visual-spatial configurations. Plaintiff's academic achievement scores were third grade reading and fifth grade math. Testing also showed Plaintiff's Developmental Age Range, at age 18, was between 9 years old and 9 years, 5 months old.

Dr. Shaver found that Plaintiff's cognitive weaknesses included general information, abstract verbal reasoning, social judgment, part-whole synthesis and graphomotor integration. Areas of relative strength included awareness of environmental detail and operating in tasks that required a combination of speed and fine-finger dexterity. Because it was Plaintiff's final year of school, he recommended she undergo a comprehensive evaluation by Vocational Rehabilitation Services "in order to more accurately determine her level of employability and independent living." He opined

5

that she "should have no difficulty functioning within any type of structured employment program such as a sheltered workshop" (R. 122).

On December 11, 2003, Plaintiff was evaluated by Licensed Psychologist Tina Yost, Ed.D. (R. 128). She was 32 and lived with her parents and her 5-month-old son. She had always lived with her parents. She was driven to the evaluation by a family member, but did have a driver's license. She said that the police helped her pass the test by giving her a tutor and reading the exam to her. She told Dr. Yost the police "kind of helped me a lot" because she had "flunked" the test so many times. She rarely drove and when she did it was only on local roads, never the Interstate.

Plaintiff told Dr. Yost she had tried to work, but couldn't read well and was "too slow." She said she last worked at Kentucky Fried Chicken, "but that didn't work out." Then she worked at Burger King, but said they fired her because she "couldn't do the work." She had not been employed since then. She reported anxiety when she was working because "a whole bunch of stuff would come up on the screen and I couldn't read." She denied anxiety in general and reported a good mood. Dr. Yost did not do any IQ testing, instead referring to the scores from 1979 and 1990. She noted Plaintiff had never had any mental treatment.

Upon Mental Status Examination, Plaintiff was dressed casually but appropriately and her grooming appeared adequate (R. 129). She was cooperative and her interpersonal behavior was within normal limits. Her speech and communication ability were considered adequate. She was fully oriented and her mood was normal. Her affect was slightly restricted. There were no abnormalities of thought content or perception. Dr. Yost opined Plaintiff's insight was low average to poor, as was her judgment. Her immediate memory was within normal limits, her remote memory was mildly deficient, and her recent memory was markedly deficient. Her concentration was markedly deficient, based on digit span test.

6

Plaintiff reported her daily activities as awakening between 5 and 6 a.m. to feed her baby, then going back to sleep until 8 or 9 (R. 129). When her baby awakened she would get, up , change and feed him, bathe him and play with him. She would feed him again after his nap. She had regular contact with friends and did housework and laundry. She and her mother both cooked. Her mother did the shopping.

Dr. Yost diagnosed Plaintiff with Borderline Intellectual Functioning, by history, opined her prognosis was "fair," and found she would be competent to manage an allowance.

On January 2, 2004, State agency reviewing psychologist Frank D. Roman, Ed.D. completed a Psychiatric Review Technique ("PRT") finding Plaintiff had Borderline Intellectual Functioning, and evaluating her under Listing 12.02, for Organic Mental Disorders (R. 132). He opined she had a mild limitation on activities of daily living and social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation (R. 141).

Dr. Roman also completed a Mental Residual Functional Capacity Assessment ("MRFC"), opining Plaintiff would be moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (R. 145-146). She would otherwise not be significantly limited.

Dr. Roman expressly found Plaintiff did not meet or equal a Listing (R. 147). He found that it appeared she would be able to perform routine repetitive work activities.

On February 7, 2005, Shirley Thomas, Plaintiff's former supervisor in food service at Fairmont State University, wrote:

> When she filled out the application she needed help as she had trouble with reading and comprehending what exactly they wanted on the application. At the time it was

my decision as to whether she would be hired. After being hired I found she had trouble understanding and following directions especially when she had to do any multi tasking. She really needed to be reminded on a daily basis.

I don't think Jennifer would have been hired or kept her job as long as she did had I not known her by living in the same community with her.

(R. 110).

On February 9, 2005, Alice Jean Muto, Plaintiff's former teacher, wrote the following:

Please be aware of the fact, that I was employed by the Marion County Board of Education as a teacher of the mentally challenged during the time that Jennifer Ice was a student at North Marion High school.

Jennifer was enrolled in this program. This program addressed the needs of students, that were experiencing difficulty in comprehending what was expected of them academically. Please keep in mind this did not address the social aspects of each individual, although through exposure in a class situation this was indirectly addressed.

During her enrollment in my classes, Jennifer was required to meet individual goals that were addressed in her Individual Educational Plan (IEP). Even though I do not have a copy of the exact plan that was in effect during this time, I feel certain that Jennifer's plan was instrumental in addressing Jennifer's inability to stay on task, due to her limited cognitive abilities especially those involved with multi-task assignments.

I have not been personally involved in Jennifer's employment progress or social status since she left the school system, however, unless some dramatic changes have occurred it is my opinion that her success in the workforce would be hampered greatly because of her inability to perform at the level that is expected of most in the workforce.

(R. 111).

At the Administrative Hearing in August 2005, the following colloquy took place:

ALJ:     Now, Ms. Ice, as I'm sure Mrs. Carpenter's discussed with you, we take testimony in our proceedings under oath and under penalties of perjury, and it's recorded on the tape recording machine in front of us. Because it's recorded, you need to make sure your answers are made orally and loud enough to hear. Now - -

CLMT:    What does orally mean?

8

| | |
|---|---|
| ALJ: | Orally means out loud. You have to speak your answers. And if any of my questions or if any of Mrs. Carpenter's questions are unclear, just forget, just ask us to ask it over again. And now, the claimant's mother is planning to testify, is that correct? |
| ATTY: | Yes, sir. |
| ALJ: | Do either of you have any religious or other objection to swearing an oath? |
| WTN: | No. |
| ALJ: | Ms. Ice, do you have any religious or other objection to swearing an oath? |
| CLMT: | No [INAUDIBLE]. |
| ALJ: | Okay. |
| ATTY: | That means is it okay with you if you raise your right hand and swear to tell the truth. |
| CLMT: | Oh. |
| ATTY: | Is that okay? |
| ALJ: | Yeah. Do you want to - - |
| ATTY: | Right hand. |
| ALJ: | - - Stand and raise your right hand, the - - |
| ATTY: | Other one. |
| . . . . ALJ: | Now, what's your current address, Jennifer? |
| CLMT: | Box 705. |
| ALJ: | In Barrackville? |
| CLMT: | Yes. |
| ALJ: | Okay. And what's your birth date? |
| CLMT: | August 23rd. |
| ALJ: | '71? |

CLMT:        I think so, yeah.

(R. 161-163).

When asked if she was right or left-handed, Plaintiff responded: "Use this hand." (R. 164).

When asked if she had worked before, Plaintiff said she worked at the college, "putting out cups and

stuff," but "got in trouble by doing that." She got the job because of "my mom and Shirley,"

explaining that Shirley lived behind them and "kind of helped" her. Shirley was the boss where she

worked, and Plaintiff's mother worked there also. Plaintiff testified her mother had to stand beside

her at work. She testified she still "got in trouble" when she was a dishwasher, however, because

she only put two dishes on the trays at a time. When asked how many were supposed to be put on

the tray, she replied she did not know. She testified she was moved out of the dishwashing job the

same day she started. She was then assigned to making french fries, but "they said [she] wasn't

shaking it, shaking it enough, just to over to the other side to dump them." She also "got into trouble

because [she] was[] putting too much fries down, or not enough." Plaintiff said she did not know

how many fries she was supposed to put down, even though they told her.

Plaintiff testified she also "got in trouble" because another employee made her mad and she

squirted ketchup on her (R. 168). She was mad "because Shirley told me to do something and she

told me to do something else." She also testified: "She told me to do the work but she wasn't doing

the work, so I just picked her up and moved her into the office and told her to sit" (R. 169) She

physically carried the woman. Afterward, Shirley moved her "to cups and stuff," but she "got in

trouble" doing that because when told she wasn't putting enough cups out, she "put the whole thing

out."

Plaintiff testified: "when they got rid of Shirley, I had to quit, and then they told me I can

10

come back, and then when Alladin [phonetic] came in, they didn't like me and didn't want me there." Her mother still worked there. Plaintiff also testified she had had a number of other jobs, each of which lasted approximately a week to a month before she was let go.

Plaintiff testified that her mother and father both worked (R. 173). They had neighbors come over and check on her. She went over to the neighbor's house sometimes. She dusted the living room. She took care of her son "[p]retty good." She had learned to change his diapers and dress him. Her mother had to help her "sometimes," depending on "if he cries a lot." She did the laundry "[s]ometimes, if I don't mess the clothes up. Like always bleach the clothes or they end up turning pink, so I got to leave that alone." She just did the dark clothes, not the whites. Her mother did the rest. She cooked, but only using the microwave. Her mother cooked extra at dinner so Plaintiff could heat it up in the microwave for her son's lunch. She could also make a sandwich or a hot dog.

Plaintiff testified she could not handle money, and all her money was in a savings account where her mother and father took care of it. She said she could not count money. She did not have a checkbook or know how to write a check. She did go shopping, but only with her mother. She generally gave her mother her money, and asked her to buy things. She had friends, but she never went out with them. They came to her house. She went to church, but only if her mother and father took her (R. 178).

Plaintiff's mother, Rita Ice, then testified that Plaintiff had left home twice to live "with a guy and lived with his family," but then came home after a few months both times. Otherwise she had always lived at home. Regarding Plaintiff's work at the college, Mrs. Ice testified that Plaintiff did "okay" as long as she was "right there telling her what to do." As an example, she testified that Plaintiff was putting burgers together, or putting them in the machine to cook. At lunchtime, they

11

would put a lot of burgers up, but later in the day, when there would be perhaps only two people in line, Plaintiff "just kept making them and putting them up there . . . She didn't, she doesn't know when to quit on her own. Somebody had to tell her all the time." She did not know when to slow down or speed up. She would also put out too many cups or put them in the wrong place. When she was switched to cleaning, she did okay, but "would just like wander off." She knew when it was time to clean, because others would tell her, and they would all be cleaning at that time. Mrs. Ice was Plaintiff's supervisor for about a year, and otherwise the supervisor was Shirley Thomas. Eventually, the employer "just did away with" Plaintiff. The employees worked until summer came, and then were called back in fall. But the new employer did not call Plaintiff back.

Mrs. Ice testified that Plaintiff was very friendly and would get along really well with other people and joke around, "and then she'd just get mad all of a sudden, and then, say they would have an argument or something, and the other person'd still be mad and then she'd just forget it." Sometimes she got so mad that Shirley, the supervisor, "would have to take her in the office and sit her down and talk to her and get her calmed down, you know, that type of thing" (R. 183). This happened about three times per month.

Mrs. Ice testified that Plaintiff did fairly well around the house, and was able to take care of herself and her baby. She dusted, ran the sweeper, washed her clothes, fixed the baby lunch ("just like microwave stuff or, or leftovers, you know, she can't cook a meal but she can heat stuff up.") She did testify that although she tried to get Plaintiff to separate the light and dark clothes Plaintiff did not, and just threw them all in together. She testified that Plaintiff did not do well handling money. She could save sometimes, but she had no concept of how much something cost. For example, Plaintiff only noticed the first number in a price, so that if something cost $3.99, Plaintiff

said it cost $3.00 (R. 185). Mrs. Ice did testify that Plaintiff was really good with the baby, bathing him, feeding him, and tending to him without needing to be reminded.

The ALJ asked the VE if there would be any jobs at any exertional level that involved no reading or writing, no detailed or complex instructions, no close concentration or attention to detail for extended periods, no travel as part of the job, and no requirement to set goals or production goals (R. 188). The VE testified that the jobs of kitchen helper, industrial cleaner, and equipment cleaner would exist with those limitations. If the person had difficulty completing "even simple job instructions without supervision" there would be an adverse impact on all jobs, even unskilled. If the person was off task for one unscheduled hour during the work day, there would be no jobs.

Counsel for Plaintiff argued at the hearing that Plaintiff would meet or equal Listing 12.05C because she believed the level of impairment Plaintiff had would constitute an additional and significant mental impairment, in addition to her IQ that did meet the requirement of the Listing. Counsel also argued that Plaintiff met or equaled 12.05D.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and disability insurance benefits as set forth in section 216(i) of the Social Security Act through December 31, 2007.

2.  The claimant has not engaged in substantial gainful activity since April 15, 2002 (20 CFR §§ 404.1520(b) and 416.920(b)).

3.  The claimant has the following severe impairment: mild mental retardation (20 CFR §§ 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404,

Subpart P, Appendix 1, Regulations No. 4 (20 CFR §§ 404.1520(d) and 416.920(d)).

5.      Upon careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work at any exertional level that requires no reading or writing; no detailed or complex instructions; no close concentration or attention to details for extended periods; no travel as part of the job; and no requirement to set workplace goals.

6.      The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7.      The claimant was born on August 23, 1971 and was 30 years old on the alleged disability onset date, which is defined as a younger individual (20 CFR §§ 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR §§ 404.1568 and 416.968).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR §§ 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.      The claimant has not been under a "disability," as defined in the Social Security Act, from April 15, 2002 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 17-22).

## IV. Contentions

A.      Plaintiff contends:

The ALJ's decision is not supported by substantial evidence because the ALJ failed to evaluate the credibility of the claimant, her mother and the statements of a co-worker and if found credible, the claimant would meet Listing 12.05D and would have a residual functional capacity that is totally disabling.

1.      The ALJ's finding that " . . . the claimant's statements concerning the

intensity, duration and limiting effects of these symptoms are not fully credible" is not an adequate evaluation of her credibility that is required by the Regulations, Ruling 96-7p and the Fourth Circuit.

2. The ALJ's decision is not supported by substantial evidence because the ALJ did not weigh the testimony of the claimant's mother's testimony [sic] which was more than corroborating nor did he weigh the letter submitted by the claimant's supervisor where she worked.

B. The Commissioner contends substantial evidence supports the ALJ's RFC assessment.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

15

## B. Credibility

The sole issue raised by Plaintiff is that the ALJ did not properly evaluate her credibility, especially in conjunction with her mother's corroborating testimony and the corroborating letters from her former supervisor, Shirley Thomas, and her former high school teacher, Alice Muto. Plaintiff argues that if this testimony and the letters were found credible, there would be no work available for her. The undersigned agrees with this argument. The VE testified that if a hypothetical individual had difficulty completing "even simple job instructions without supervision" there would be an adverse impact on all jobs, even unskilled. Also, if the individual would be off task for one unscheduled hour during the work day, there would be no jobs. Plaintiff's and her mother's testimony, as well as the letters from Ms. Thomas and Ms. Muto, if found credible, would support a finding that Plaintiff could not complete simple job instructions without supervision and would be off task for at least one unscheduled hour during the workday.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Cf. Jenkins, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be

expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

Here the ALJ determined that Plaintiff met the first, threshold step. He was therefore required to evaluate her credibility, taking into account "all the available evidence." A review of the ALJ's decision does not reveal that he took into account "all the available evidence." First, in his analysis of the Listings, the ALJ found:

> The report of the examining psychologist reports that the claimant has a relative [sic] full range of activities of daily living including caring for her two-year old child, cooking, doing housework and doing laundry. The claimant also has regular contact with friends. This report indicates that the claimant has marked difficulty maintaining concentration; however, there is no other evidence of so severe difficulty concentrating. The fact that the claimant can cook and care for a child indicates that the claimant is less than markedly deficient in concentration.

(R. 18). In his credibility analysis, the ALJ noted:

> The Administrative Law Judge notes that the claimant receives no treatment or medication for any mental or physical condition. She readily reports that she is capable of caring for her son and performing housework and cooking that requires concentration and persistence.

Plaintiff's testimony was that she did care for her son, but that they both lived with her parents. Her mother and father both worked, but they had neighbors come over and check on her.

17

She took care of her son "[p]retty good." She had learned to change his diapers and dress him. Her mother had to help her "sometimes," depending on "if he cries a lot." She did the laundry "[s]ometimes, if I don't mess the clothes up. Like always bleach the clothes or they end up turning pink, so I got to leave that alone." She just did the dark clothes, not the whites. Her mother did the rest. She cooked, but only using the microwave. Her mother cooked extra at dinner so Plaintiff could heat it up in the microwave for her son's lunch. She could also make a sandwich or a hot dog. Plaintiff testified she could not handle money, and all her money was in a savings account where her mother and father took care of it. She said she could not count money. She did not have a checkbook or know how to write a check. She did go shopping, but only with her mother. She generally gave her mother her money, and asked her to buy things. She had friends, but she never went out with them. They came to her house. She went to church, but only if her mother and father drove her there and went also (R. 178).

Plaintiff's mother testified that Plaintiff did fairly well around the house, and was able to take care of herself and her baby. She dusted, ran the sweeper, washed her clothes, and fixed the baby lunch ("just like microwave stuff or, or leftovers, you know, she can't cook a meal but she can heat stuff up.") She did testify that although she tried to get Plaintiff to separate the light and dark clothes she did not do that, and just threw them in together. She testified that Plaintiff did not do well handling money. She could save sometimes, but she had no concept of how much something cost. For instance, she only noticed the first number in a price, so that if something cost $3.99, Plaintiff said it cost $3.00 (R. 185). Interestingly, this bit of testimony is corroborated by the school psychologists' reports that Plaintiff would decode the first letter sound in a word, and then just guess the word from that initial sound. Mrs. Ice did testify that Plaintiff was really good with the baby,

18

feeding, bathing, and tending to him without needing to be reminded. Nevertheless, considering the testimony, the undersigned still cannot find that substantial evidence supports the ALJ's finding that Plaintiff's caring for her son and the actual housework and cooking she does "requires concentration and persistence."

The ALJ did not address either Plaintiff's testimony or her mother's, especially regarding her work experiences. In fact, he did not mention Mrs. Ice's testimony at all except in the "Jurisdiction and Procedural History" portion of his decision, where it was mentioned without comment. Mrs. Ice's testimony corroborated Plaintiff's testimony that her "cooking" consisted solely of heating up food in the microwave, usually extra food her mother prepared for just such a purpose. Mrs. Ice's testimony corroborates Plaintiff's that, although she did the laundry, she always threw the darks in with the whites, and did not separate them, despite being instructed on how to do so, and in spite of having turned all the whites pink or red on occasion.

The ALJ also did not mention Mrs. Thomas' or Mrs. Muto's letters, both of which corroborate Plaintiff's and her mother's testimony regarding Plaintiff's ability to follow directions and stay on task, and generally to compete in the work force.

Social Security Ruling ("SSR") 85-16, concerning RFC for mental impairments, provides, in pertinent part:

> . . . . The determination of mental RFC involves the consideration of evidence, such as: . . . . Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.

Additionally:

> Other evidence also may play a vital role in the determination of the effects of impairment. To arrive at an overall assessment of the effects of mental impairment, relevant, reliable information, obtained from third party sources such as social workers, previous employers, family members, and staff members of halfway houses,

mental health centers, and community centers, may be valuable in assessing an individual's level of activities of daily living. Information concerning an individual's performance in any work setting (including sheltered work and volunteer or competitive work), as well as the circumstances surrounding the termination of the work effort, may be pertinent in assessing the individual's ability to function in a competitive work environment.

Here the ALJ did not consider (at least as evidenced in his decision), the testimony and reports regarding Plaintiff's work activity or the testimony and letters from the third parties regarding her performance and behavior. He did not discuss the mother's, supervisor's or teacher's statements, or, in fact, any evidence concerning Plaintiff's efforts to get and keep a job or her terminations from those jobs.

The undersigned finds the ALJ did not consider "all the available evidence" in evaluating Plaintiff's credibility. For this reason alone, substantial evidence does not support the ALJ's credibility determination, his RFC or his finding that there were jobs available in the national economy that Plaintiff was capable of performing.

Additionally, the undersigned finds several other significant omissions in the evidence recited in the ALJ's decision. For example, the ALJ notes that pursuant to the 1979 evaluation, the school psychologist stated that Plaintiff's gross motor skills did not appear to be as delayed as her fine motor scores <u>and regular physical education was recommended</u>. Importantly, however, physical education was the <u>only</u> class in which it was recommended Plaintiff be mainstreamed at the time, and the psychologist's recommendation was that she be placed in regular physical education <u>"as long as she had special services for assistance in developing fine motor skills."</u> (Emphasis added).

Further, the ALJ noted that Dr. Shaver, the school psychologist who examined Plaintiff when she was 18, recommended Plaintiff be evaluated by vocational rehabilitation in order to more accurately determine her level of employability and independent living. He also stated: "Dr. Shaver

opined that the claimant <u>would</u> have no difficulty functioning within a structured employment program." (Emphasis added). Dr. Shaver, however, <u>actually</u> said that Plaintiff "<u>should</u> have no difficulty functioning within any type of structured employment program <u>such as a sheltered workshop</u>" (R. 122). (Emphasis added). The undersigned believes these few additional words make a significant difference. Additionally, while the ALJ focused on the word "employability" in the recommendation, the undersigned finds significant that Dr. Shaver found a need for an evaluation of Plaintiff's level of independent living, especially considering that at age 33, she had never lived independently.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff's statements and testimony regarding her limitations were not entirely credible.

Although not directly argued, it follows that substantial evidence also does not support the ALJ's hypothetical to the VE. The ALJ's hypothetical limited Plaintiff only as to "no reading or writing, no detailed or complex instructions, no close concentration or attention to detail for extended periods, no travel as part of the job, and no requirement to set goals, production goals or anything like that" (R. 188). There is no requirement whatsoever regarding supervision, for example. If the testimony and statements were credible, Plaintiff would not be able to complete even simple work instructions without supervision. The VE testified that that limitation would adversely affect all jobs. The VE also testified that if a person were off task one unscheduled hour during the workday, there would be no jobs, even unskilled. The testimony and statements, if credible, also support such a limitation. For example, Plaintiff's mother testified Plaintiff would just "wander off" while she was at work.

In response to the ALJ's hypothetical, the VE testified the individual could perform the jobs

of kitchen help (undisputedly the type of job Plaintiff held with her mother and Mrs. Thomas as immediate supervisors), industrial cleaner, and equipment cleaner. The undersigned notes that, according to the Dictionary of Occupational Titles ("DOT"), all three of these occupations have a General Education Development ("GED") Level of Reasoning Development ("LR") of 2. An LR of 2 is defined as the ability to:

> apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

The ALJ expressly did not limit Plaintiff to "routine, repetitive work involving simple, one-to-two-step instructions," as the undersigned has so often seen in these cases. This type of work would correspond to only an LR of 1, which is defined as the ability to:

> apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

The undersigned finds significant that the only Functional Capacity Assessment in the record, completed by reviewing psychologist Roman, concluded that it "appear[ed] [Plaintiff] could perform routine, repetitive work activities." Yet the ALJ's hypothetical did not refer to "routine, repetitive work activities."

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at any time from April 15, 2002, through the date of his decision.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for SSI and DIB is not supported by substantial evidence, and I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry11] be **DENIED**, and Plaintiff's Motion

for Summary Judgment [Docket Entry 9] be **GRANTED** by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __*19*__ day of April, 2007.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE